# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 21-507V**
**Filed: February 24, 2026**

|  |  |
|---|---|
| RICHARD ROBINSON,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Special Master Horner |

*Jonathan Joseph Svitak, Shannon Law Group, P.C., Woodridge, IL, for petitioner.*
*Mallori Browne Openchowski, U.S. Department of Justice, Washington, DC, for respondent.*

### **DECISION**[1]

On January 11, 2021, petitioner filed a petition under the National Childhood Vaccine Injury Act ("Vaccine Act"), 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that he suffered a Table Injury of a Shoulder Injury Related to Vaccine Administration ("SIRVA") affecting his left shoulder and following an influenza ("flu") vaccination he received on September 28, 2019.  (ECF No. 1.)  For the reasons set forth below, I conclude that petitioner is *not* entitled to compensation.

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

## I.     Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines.  In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious, long-standing injury; and has received no previous award or settlement on account of the injury.  Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury.

In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury."  That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table.  If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination.  § 300aa-13(a)(1); § 300aa-11(c)(1)(C)(i); § 300aa-14(a).

As relevant here, the Vaccine Injury Table lists SIRVA as a compensable injury if it occurs within 48 hours of vaccine administration.  § 300aa-14(a), *amended by* 42 C.F.R. § 100.3.  Table Injury cases are guided by statutory "Qualifications and aids in interpretation" ("QAI"), which provide more detailed explanation of what should be considered when determining whether a petitioner has suffered an injury listed on the Vaccine Injury Table.  42 C.F.R. § 100.3(c).  To be considered a "Table SIRVA," a petitioner must show that his/her injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm.  These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction.  SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.).  SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i)     No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

2

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, and any other neuropathy).

42 CFR § 100.3(c)(10).

Alternatively, if no injury falling within the Table can be shown, the petitioner may still demonstrate entitlement to an award by showing that the vaccine recipient's injury was caused-in-fact by the vaccination in question. § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii). To so demonstrate, a petitioner must show that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321-22 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). In particular, a petitioner must show by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury in order to prove causation-in-fact. *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

For both Table and Non-Table claims, Vaccine Program petitioners must establish their claim by a "preponderance of the evidence." § 300aa-13(a)(1). That is, a petitioner must present evidence sufficient to show "that the existence of a fact is more probable than its nonexistence." *Moberly*, 592 F.3d at 1322 n.2. Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 872-73 (Fed. Cir. 1991). However, a petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1). Once a petitioner has established their *prima facie* case, the burden then shifts to respondent to prove, also by preponderant evidence, that the alleged injury was caused by a factor unrelated to vaccination. *Althen*, 418 F.3d at 1278 (citations omitted); § 300aa-13(a)(1)(B).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record but are empowered to determine the format for taking

evidence based on the circumstances of each case, including having the discretion to decide cases without an evidentiary hearing.  Vaccine Rule 3(b)(2); Vaccine Rule 8(a); Vaccine Rule 8(d).  Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties.  Vaccine Rule 8(b)(1).

## II.    Procedural History

After this case was initially filed, it remained in Pre-Assignment Review ("PAR") for over a year and a half while petitioner filed medical records to support the claim. During this period, petitioner filed Exhibits 1-13, mostly consisting of medical records, but also including an affidavit marked as Exhibit 1 and a PAR questionnaire marked as Exhibit 10.  Based on the allegations in the petition, this case was initially assigned to the Chief Special Master as part of the Special Processing Unit ("SPU"), which is intended to expedite cases having a high likelihood of informal resolution.  (ECF Nos. 27-28.)  Thereafter, petitioner was directed to present a demand to respondent, but also to file a second affidavit addressing a notation in his medical records indicating that he had been experiencing chronic shoulder pain.  (ECF No. 34, p. 2 (citing Ex. 4, p. 5).)

Petitioner filed his second affidavit in June of 2023 (Ex. 14); however, respondent was unwilling to engage in settlement discussions (ECF No. 38) and filed a Rule 4 Report recommending against compensation in October of 2023 (ECF No. 39). Respondent argued that petitioner could not meet any of the elements of a Table SIRVA, noting he had preexisting left shoulder pain, that he did not demonstrate onset of new symptoms within 48 hours of his vaccination, that his pain was not limited to his left shoulder, and that his condition was otherwise explained by arthritis.  (*Id*. at 7-8.)  As a result, the case was reassigned to the undersigned for further litigation. (ECF Nos. 40-41.)

After the case was reassigned, I noted that petitioner's medical records lacked any indication of how petitioner came to be referred to both physical therapy and orthopedic evaluation for his left shoulder complaints.  (ECF No. 42.)  I explained that this information may be significant in light of respondent's defense of the case and directed the parties to address the issue.  (*Id*.)  Petitioner then filed additional medical records in May of 2024 (Ex. 15), though these records did not include any medical encounter records that would explain the referrals.

Petitioner was then directed to file a status report on behalf of the parties indicating whether they proposed to first resolve the factual question of onset or the medical issue of petitioner's chronic osteoarthritis.  Petitioner did not comply with this order and so he was instead directed to file an expert report supporting his claim. However, advising that he was unable to secure an expert opinion, petitioner instead moved for a ruling on the written record.  (ECF No. 52, p. 2.)  Respondent filed his response in February of 2025 (ECF No. 53), and petitioner did not file any reply.

In light of the above, I have determined that the parties have had a full and fair opportunity to develop the record and that it is appropriate to rule on the existing record. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record"). Accordingly, petitioner's motion is now ripe for resolution.

### III.   Summary of Record Evidence

Petitioner received the flu vaccination at issue in his left deltoid on September 28, 2019. (Ex. 6, p. 3; Ex. 1, p. 2.) He was sixty-eight years old at the time with a history that included, *inter alia*, fibromyalgia, chronic pain and fatigue, and generalized osteoarthritis. (Ex. 11, pp. 2, 15; Ex. 1, p. 1.) Both petitioner's medical records (Ex. 4, p. 1) and his affidavit submitted for this case (Ex. 14, p. 1) confirm that he was experiencing chronic left shoulder pain prior to his receipt of this vaccination. However, he averred that his pre-vaccination pain was only occasional, "never constant or severe and would eventually subside completely."[3] (*Id*.) Petitioner further averred that, after vaccination, "the pain in my left shoulder became constant and severe and began to limit my range of motion." (*Id*.) Petitioner stated that he was pain-free at the time of vaccination and that, within 48 hours of vaccination, he "began to feel pain and soreness in my left arm and shoulder that progressively worsened." (Ex. 1, p. 2.)

On October 15, 2019, about seventeen days post-vaccination, petitioner presented to his primary care provider. (Ex. 2, pp. 14-18.) However, the reason for the encounter was to follow up regarding the results of a prior CT scan of petitioner's gallbladder. (*Id*. at 14.) Petitioner's shoulder pain was not discussed at this encounter. (*Id*. at 14-18.) Petitioner argues that it should be viewed as significant that this encounter was for a specific purpose unrelated to his shoulder. (ECF No. 52, pp. 11-12.) Notably though, while the purpose of the encounter was to review the CT scan, petitioner did also at that time report a new, unrelated symptom of "frequently losing his balance." (*Id*. at 14.) And, while the musculoskeletal exam did not specifically review petitioner's shoulder, it did assess petitioner's balance concern, noting that he "[w]as not able to stand on one foot unassisted." (*Id*. at 16.) A separate notation regarding petitioner's extremities noted that he had "full range of motion of all joints."[4] (*Id*.) Petitioner was referred to physical therapy for his balance problem and his physician also reviewed his other chronic complaints. (*Id*. at 16-17; Ex. 5, p. 118.) There is no indication in the record that petitioner followed up on the physical therapy referral for his balance issue.

---

[3] By contrast, petitioner's initial affidavit filed in this case had denied having *any* history of left shoulder pain prior to vaccination. (Ex. 1, p. 1.)

[4] However, a later encounter record from this same practice, but with a different physician, included the same notation even at an encounter during which petitioner did explicitly seek care for shoulder pain. (Ex. 2, pp. 1, 4.) Yet, unlike this record, that encounter record did additionally include a separate and more detailed shoulder examination. (*Id*. at 5.)

Petitioner averred that he had initially thought his shoulder pain would resolve on its own; however, "[m]y pain continued to worsen to the point that I sought medical treatment." (Ex. 1, p. 2.)  He further stated that, "[b]ecause my pain would not relent, I saw multiple providers at my primary care clinic, including Jennifer Gruenwald, ARNP, Dr. Fred Chavez, and Dr. David S. McKinney for my shoulder pain.  Dr. Chavez referred me to physical therapy for my left shoulder pain." (*Id.*)  The medical records document that petitioner was referred to physical therapy for his shoulder pain as of March 3, 2020, close to six months post-vaccination (Ex. 5, p. 117), but no encounter records are available to explain the referral and no records document the series of encounters petitioner averred had occurred with his primary care providers.  A later record indicates within the history that, prior to being referred to physical therapy petitioner had been seen at clinic where he had x-rays that showed moderate glenohumeral arthritis.  (Ex. 2, p. 1.)  This is noted to have occurred in February of 2020.  (*Id.* at 6.)  However, these records have not been filed.

The physical therapy referral orders indicate that the date of onset of petitioner's shoulder pain was February 25, 2020 (Ex. 15, pp. 3, 7), which is also the onset date listed on the resulting physical therapy records, though that is not the history that petitioner provided at the initial evaluation, which occurred on June 15, 2020, about eight and a half months post-vaccination (Ex. 4, p. 5; Ex. 15, p. 4).  When petitioner presented for physical therapy, he described a post-vaccination worsening of his left shoulder pain as depicted in the medical record excerpt below:

> Left shoulder has been bothering him chronically, but it worsened in October 2019 when he got a flu shot in his left upper arm. Left deltoid pain initially, but now he has pain from there all the way down to his left hand. Pt. states that his left upper arm pain is 8/10, unbearable, intense, sharp and he just wants to drop it with raising it overhead even without weight. Pt. is right hand dominant. Pt. is trying to tape and mud his living room and he is unable to even hold pan with left hand due to pain in this region. Pt. is avoiding using his left arm for lifting. He states that tingling in his upper extremity from the deltoid to left hand. Pt. has intermittent numbness in his left upper extremity fingers. Difficulties with gripping with left hand and he occasionally has sharp pain in between shoulder blades. Pt. denies neck pain, increased symptoms with coughing, sneezing. Sleep is undisturbed secondary to left shoulder pain. Difficulties with reaching behind back for showering or reaching with his left upper extremity.

(Ex. 4, p. 5; Ex. 15, p. 4.)

The physical therapist documented petitioner's function as depicted in the medical record excerpt below:

> Patient is a 69- year old male who presents with signs and symptoms consistent with left shoulder and upper extremity pain. Pt. is limited with left shoulder, elbow range of motion, which is also painful. Pt. has decreased strength, and he demonstrates spasms/myofascial restrictions in his left deltoid and upper extremity with left impingement syndrome. Pt's postural awareness is decreased and may be contributing to the persistence of pain. Pt. has significant glenohumeral joint restrictions, but it is not painful with joint mobilization and before his flu shot that started all of this he did not have significant shoulder pain. Pt. subjectively has 70% disability with limitations of pain, tingling/numbness, difficulties with dressing, gripping, and recreational activities, as well as sleeping. Pt. is appropriate for skilled PT to decrease pain and myofascial restrictions, improve range of motion and strength, and to improve functional activities.

(Ex. 4, p. 5; Ex. 15, p. 4.)  Petitioner returned to physical therapy only once and was later discharged for noncompliance.  (Ex. 11, p. 75.)

On October 26, 2020, petitioner established care with a new physician at his primary care provider's office.  (Ex. 2, p. 1.)  He presented for a "med review" and also "would like to review problems with left shoulder pain dates back about 1 year."  (*Id*.)  Petitioner explained that "his left shoulder began hurting after receiving an influenza vaccine at Walmart in September 2019."  (*Id*.)  He further explained that "the shoulder is painful when he tries to lift it above shoulder height or reach behind his back.  He does note some popping and clicking.  He denied any remote trauma to the shoulder and has not had any prior factures in this area."  (*Id*.)  He was referred to an orthopedist.  (*Id*. at 6.)

Petitioner first presented to orthopedic care with Dr. Oates on December 1, 2020.  (Ex. 7, p. 2.)  The history he provided was as depicted in the medical record excerpt below:

> **HISTORY:** Mr. Robinson is a 69 year old RHD male here for left shoulder evaluation.  He underwent a flu shot given in the lower deltoid in late September of 2020 and then has had significant pain afterwards.  He has been to physical therapy for 3 or 4 visits although he missed several due to the Covid issue.  He says there was minimal improvement.  He denies pain prior to his flu injection.  Of note the patient has an attorney for his flu shot complication.

(*Id*.)

Dr. Oates completed a physical exam and also reviewed x-ray images from February 27, 2020, which were noted in part to "reveal bone-on-bone change in the glenohumeral joint."  (*Id*. at 3.)  Dr. Oates's discussion and plan were as depicted in the medical record excerpt below:

> **DISCUSSION / PLAN:** The patient may have had a reaction to a flu shot approximately a year ago, however his radiographs clearly show osteoarthritis of the glenohumeral joint.  I would recommend an MRI to look for any fluid collections or inflammation from the shot.  I think that his symptoms currently are mostly due to the arthritic change.  I do not believe that the arthritis is a result of the corticosteroid injection.  If there is severe inflammation in the bone surrounding the joint consistent with an infection then potentially this could be due to the flu shot.  However in the absence of those findings on MRI I believe this is a case of glenohumeral osteoarthritis.  I will see him after the MRI is available for review.

(*Id*.)  The assessments at this encounter were (1) "[p]rimary osteoarthritis, left shoulder" and (2) "[c]omplication of injection, initial encounter."  (*Id*.)  Petitioner was to follow up after completing the MRI.  (*Id*.)

Petitioner then presented for a left shoulder MRI on December 7, 2020.  (Ex. 8, p. 1.)  The radiologist's impression included four findings:

(1) Tendinosis and a low to moderate grade partial tear affecting the distal supraspinatus and subscapularis, but with no full thickness rotator cuff rupture;

7

(2) Moderate to severe glenohumeral joint osteoarthritis and moderate acromioclavicular arthritis with moderate joint effusion and debris concerning for synovitis; and

(3) Evidence of an extensive labral tear; and

(4) Tendinosis and a low to moderate grade partial tear of the long head of the biceps tendon.

(*Id*. at 1-2.)

Petitioner then returned to Dr. Oates on December 15, 2020.  (Ex. 7, p. 5.)  Dr. Oates reviewed the MRI as depicted in the medical record excerpt below:

> **MRI REVIEW:** MRI scan dated 12/7/2020 is reviewed.  This shows severe degenerative joint disease of the glenohumeral joint.  There is marrow edema in the humerus which the radiologist feels is associated with a degenerative change.  There is rotator cuff degeneration but no full thickness rotator cuff tear.  There is no evidence of fluid collection or complication in the deltoid muscle from the flu shot.  I independently read this and confirmed with the radiologist reading.

(*Id.*)  And his discussion with petitioner after review of the MRI was as depicted in the medical record excerpt below:

> **DISCUSSION / PLAN:** The findings on the MRI are consistent with chronic osteoarthritis of the left shoulder.  The patient was asymptomatic prior to his flu shot.  It is possible that the muscle aches and joint pains that are associated with flu injections from time to time triggered his ongoing shoulder pain.  It did not cause the underlying chronic arthritis.  I've explained to him that this is in association in time but I cannot prove causation.  In terms of treatment of the arthritis of explained his long-term option includes the possibility of total shoulder replacement.  I may be able to give him some symptomatic relief with corticosteroid injection.  He was informed, that repeated corticosteroid injections are associated with an increased risk of infection at the time of total shoulder replacement.  He wishes to proceed.

(*Id.*)  The assessment remained unchanged.  (*Id.*)

Petitioner initially reported good relief from his cortisone injection when he returned to Dr. Oates in June of 2021, but elected to proceed with a shoulder replacement.  (Ex. 9, p. 3.)  Thus, Dr. Oates ordered a CT scan to plan for surgery.  (*Id.* at 4.)  Petitioner ultimately declined to go forward with the surgery as planned (Ex. 13, p. 4); however, the CT scan was completed in the interim.   The CT scan showed, *inter alia*, "[s]evere glenohumeral osteoarthritis with bone-on-bone appearance" and the impression was "[a]dvanced left shoulder joint degeneration."  (*Id.* at 9.)

The remainder of the medical records are less significant to the issues discussed herein.[5]

---

[5] *Moriarty v. Sec'y of Health & Human Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision."); *see also Paterek v. Sec'y of Health & Human Servs.*,

IV.    **Discussion**

a.    <u>Legal standard for fact finding</u>

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records.  § 300aa-11(c)(2).  The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions."  § 300aa-13(b)(1)(A)-(B).  However, the special master is then required to weigh all of the evidence presented.  *See Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence).  The special master is obligated to consider and compare the medical records, testimony, and all other "relevant and reliable evidence" contained in the record.  *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 204 (2013) (quoting Vaccine Rule 8) (citing § 300aa-12(d)(3)), *aff'd sub nom. LaLonde v. Sec'y of Health & Human Servs.*, 746 F.3d 1334 (Fed. Cir. 2014); *see also Burns*, 3 F.3d at 416-17.

The Federal Circuit has held that contemporaneous medical records are ordinarily to be given significant weight due to the fact that "[t]he records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.  With proper treatment hanging in the balance, accuracy has an extra premium.  These records are also generally contemporaneous to the medical events."  *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).  Thus, where medical records are clear, consistent, and complete, they should be afforded substantial weight.  *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).  However, this rule is not absolute.  There is no presumption that medical records are accurate or complete as to all of a patient's physical conditions.  *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).  Afterall, "medical records are only as accurate as the person providing the information."  *Parcells v. Sec'y of Health & Human Servs.*, No. 03-1192V, 2006 WL 2252749, at *2 (Fed. Cl. Spec. Mstr. July 18, 2006).  "[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance."  *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991) (quoting lower court opinion), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. denied sub nom. Murphy v. Sullivan*, 506 U.S. 974 (1992).  When witness testimony is offered to overcome the weight generally afforded to contemporaneous medical records, such

---

527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

testimony must be "consistent, clear, cogent[,] and compelling."  *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).  Further, a special master must consider the credibility of the individual offering the testimony.  *See Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

> b. <u>SIRVA QAI (1) – No history of pain, inflammation or dysfunction of the affected shoulder</u>

The first SIRVA criterion requires that there be no relevant prior history of shoulder concerns (pain, inflammation, or dysfunction) that could explain the post-vaccination presentation (signs, symptoms, examination findings, and/or diagnostic studies).  That is, the prior history must not be one that "would explain" the petitioner's post-vaccination presentation.  42 C.F.R. § 100.3(c)(10)(I).  Thus, ambiguous or isolated notations of prior shoulder pain do not prevent a petitioner from meeting this criterion.  *E.g.*, *Fry v. Sec'y of Health & Human Servs.*, No. 18-1091V, 2020 WL 8457671, at *3 (Fed. Cl. Spec. Mstr. Dec. 16, 2020).  The Table SIRVA criteria "does not necessarily require a spotless prior health history of the affected shoulder."  *Kelly v. Sec'y of Health & Human Servs.*, No. 17-1918V, 2022 WL 1144997, at *17 (Fed. Cl. Spec. Mstr. Mar. 24, 2022); *O'Leary v. Sec'y of Health & Human Servs.*, No. 18-584V, 2021 WL 3046617, at *8 (Fed. Cl. Spec. Mstr. June 24, 2021) (finding SIRVA QAI (I) met where petitioner had a prior remote history of shoulder trauma that had "recovered nicely").

In this case, however, petitioner acknowledges both that he had preexisting left shoulder pain and that his medical records evidence degenerative shoulder conditions including findings of osteoarthritis.  (ECF No. 52, p. 9; *see also* Ex. 14, pp. 1-2; Ex. 4, p. 5; Ex. 7, pp. 3, 5.)  Indeed, petitioner's medical records consistently note petitioner's joint degeneration to be severe, chronic, or advanced, from the time of the very first available treatment record.  (Ex. 4, p. 5; Ex. 2, p. 6; Ex. 7, p. 5; Ex. 9, p. 4; Ex. 13, p. 9.)  Nonetheless, he argues that "[t]hese findings, absent some connection to petitioner's symptoms do not rise to the level of a disqualifying fact for the purposes of establishing a Table SIRVA."  (ECF No. 52, p. 10.)  Instead, he argues that "his physicians do not clearly attribute his symptoms to his osteoarthritis."  (*Id.*)  Petitioner argues that his preexisting arthritis would have to wholly explain his symptoms independent of vaccination before it would counsel against his SIRVA claim.  (*Id.* (citing *Lang v. Sec'y of Health & Human Servs.*, No. 17-995V, 2020 WL 7873272, at *13 (Fed. Cl. Spec. Mstr. Dec. 11, 2020)).)[6]

---

[6] Respondent reasonably argues that *Lang* is distinguishable, because the analysis petitioner cites pertained to the fourth SIRVA QAI criterion, rather than the first criterion, in a case in which the petitioner had been found not to have any prior history of shoulder pain or dysfunction.  (ECF No. 53, pp. 7-8.)  Though they can be interrelated, the first and fourth SIRVA QAI criteria are distinct analyses.

As a threshold matter, petitioner does not accurately characterize his orthopedist's diagnosis and opinion.  When petitioner first presented for an orthopedic evaluation, Dr. Oates stressed that petitioner's x-rays (which showed bone-on-bone change in the glenohumeral joint) "clearly show" osteoarthritis.  (Ex. 7, p. 3.)  And, while Dr. Oates was willing to contemplate an additional role for petitioner's vaccination in "potentially" affecting his condition, he noted that "I think that his symptoms currently are mostly due to the arthritic change."  (*Id.*)  After petitioner underwent an MRI, which Dr. Oates interpreted as showing "severe degenerative joint disease" and no evidence of complication from the flu shot, Dr. Oates then advised that petitioner suffered chronic and severe osteoarthritis of the left shoulder and that the flu vaccine "did not cause the underlying chronic arthritis."  (*Id.* at 5.)  Thus, even accepting that Dr. Oates did not entirely rule out the vaccine as an additional contributing factor, Dr. Oates very clearly did diagnose petitioner's condition as chronic osteoarthritis and did attribute petitioner's symptoms to that osteoarthritis.

Additionally, petitioner has not been diagnosed with any shoulder condition other than osteoarthritis[7] and, apart from his own subjective attribution of his shoulder pain to his vaccination, petitioner has not explained how his post-vaccination presentation is inconsistent with the chronic osteoarthritis he otherwise admits pre-dated his vaccination.  Even as they entertained his report of a post-vaccination onset, none of petitioner's treating physicians actually opined that any of the signs, symptoms, examination findings, and/or diagnostic studies, relating to petitioner's post-vaccination presentation were incompatible or inconsistent with osteoarthritis.  And, of course, petitioner was unable to secure an expert opinion to otherwise support such an assertion.  Indeed, when petitioner's primary care provider referred him for orthopedic evaluation, it was noted to be specifically out of concern for arthritis.  (Ex. 5, pp. 7, 116.)

As petitioner stresses, Dr. Oates did also offer some reasoning as to how the vaccination may have also contributed to petitioner's overall condition.  (ECF No. 52, p. 10 (citing Ex. 9).)  However, this is not persuasive for several reasons.  First, Dr. Oates's opinion was only ever tentatively stated.  He initially stated that petitioner "may have had a reaction to his flu shot," but immediately followed that notation with the assertion that "however his radiographs clearly show osteoarthritis of the glenohumeral joint." (Ex. 7, p. 3.)  Moreover, he premised this opinion on subsequent MRI support, which he ultimately found to be lacking.  (*Compare id.* at 3, *with id.* at 5.)  After reading petitioner's MRI, Dr. Oates felt that vaccine involvement was merely "possible."  (*Id.* at 5.)  Second, and relatedly, Dr. Oates's explanation as to how petitioner's vaccine may have played a role did not remain consistent.  When Dr. Oates first saw petitioner, he speculated that petitioner's MRI might demonstrate either inflammation of fluid collections relative to the injection (*Id.* at 3), but after the MRI was negative for such a finding, he instead suggested that perhaps "muscle aches and joint pains that are associated with flu injections from time to time triggered his ongoing shoulder pain" (*Id.* at 5).  Yet, this latter explanation lacks any actual reasoning to explain that view, and

---

[7] The orthopedist did also list the ICD code for "complication of injection" under his assessment.  (*E.g.*, Ex. 7, p. 5.)

Dr. Oates further explicitly reiterated that the vaccine did not cause the arthritis and that "I cannot prove causation."[8]  (*Id.*)  Reading Dr. Oates's assessment over the course of the two encounters holistically, he appears to have believed that a post-vaccination process was a less likely explanation than osteoarthritis.  And, finally, the medical records reveal that, contrary to what the evidence otherwise shows, petitioner reported to Dr. Oates that he had been asymptomatic prior to vaccination.  (*Id.*)  This fatally undercuts any notion that there would be significance in the fact that Dr. Oates's assessment did not clearly or explicitly encompass his pre-vaccination shoulder pain.

For all these reasons, petitioner has not met his burden of proof under the first SIRVA criterion.

### c.   SIRVA QAI (2) – Pain occurs within the specified time-frame (*i.e.* 48 hours)

The second SIRVA criterion requires that the petitioner experience an onset of shoulder pain within 48 hours of the vaccination at issue.  42 C.F.R. § 100.3(c)(10)(II).  The Vaccine Act explicitly instructs that a special master may find the time period for the first symptom or manifestation of onset required for a Table Injury is satisfied "even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period."  § 300aa-13(b)(2).  However, such a finding must in all events be supported by preponderant evidence.  *Id*.

Petitioner implicitly acknowledges both that he delayed seeking care for a significant period of time and also that he did not report his shoulder pain at the first available opportunity, *i.e.*, that an intervening medical appointment occurred before he first reported and sought treatment for his alleged injury.  (ECF No. 52, pp. 10-12.)  However, he argues that neither of these factors is dispositive of the onset of shoulder pain.  (*Id.*)  In particular, he contends that, because his October 15, 2019 encounter occurred during a period when petitioners commonly delay treatment, "another layer of analysis" is needed to determine the purpose of the intervening medical appointment and whether it was therefore reasonable for the shoulder pain to go unmentioned.  (*Id.* at 11 (citing *Williams v. Sec'y of Health & Human Servs.*, No. 17-830V, 2019 WL 1040410, at *8, *23 (Fed. Cl. Spec. Mstr. Jan. 31, 2019)).)  Because the October 15, 2019 encounter was for a specific purpose, petitioner argues that the history he later provided once he did start pursuing treatment should be credited.  (*Id.* at 12.)

While petitioner is correct that neither his delay in seeking care nor his October 15, 2019 encounter are singularly dispositive, they are still potentially probative with careful consideration.  "Although treatment delays do not in all cases prevent SIRVAs

---

[8] I stress here that I am not placing a burden on petitioner to prove that his condition was vaccine caused, as that would be inconsistent with the presumption of causation he is afforded if he meets the Table requirements.  The nature of Dr. Oates's opinion as to a potential causal relationship between the vaccination and petitioner's diagnosed condition is relevant to the Table analysis only with respect to assessing petitioner's argument that his treating physicians had not clearly connected his symptoms to his osteoarthritis.  Dr. Oates's causal opinion is otherwise separately assessed with respect to causation-in-fact, below.

from succeeding, lengthy delays in seeking care cast doubt on whether a claimant can substantiate a connection between vaccination and an alleged injury, and may result in dismissal." *Nomick v. Sec'y of Health & Human Servs.*, No. 22-1538V, 2025 WL 2953202, at *10 (Fed. Cl. Spec. Mstr. Sept. 19, 2025). Thus, for example, similar to this case, a prior petitioner did not establish an immediate post-vaccination onset of shoulder pain where her medical records did not associate her shoulder pain to her vaccination until nearly seven months post-vaccination and she had already had a full physical exam from her primary care provider about two months post-vaccination. *Orban v. Sec'y of Health & Human Servs.*, No. 21-0978V, 2024 WL 3205134, at *10-12 (Fed. Cl. Spec. Mstr. May 28, 2024); *see also N.B. v. Sec'y of Health & Human Servs.*, No. 20-0151V, 2023 WL 183458, at *4, *7-8 (Fed. Cl. Spec. Mstr. July 19, 2022) (finding onset was not within 48 hours when the petitioner did not report shoulder pain until four months after vaccination despite multiple intervening appointments – including one with her PCP, from whom she ultimately sought care for her shoulder problem – that were silent on shoulder pain); *Porcello v. Sec'y of Health & Human Servs.*, No. 17-1255V, 2020 WL 4725507, at *1-2, 9-10 (Fed. Cl. Spec. Mstr. June 22, 2020) (dismissing claim where the petitioner did not report arm pain until nearly four months after vaccination, despite intervening examination finding normal range of motion), *mot. for rev. denied*, 152 Fed. Cl. 469 (2020).

Here, although petitioner's October 15, 2019 primary care encounter was initiated for the specific purpose of reviewing his CT scan, the record confirms that petitioner did take the opportunity to raise a new medical issue (balance problems) and that his other chronic problems were also discussed. (Ex. 2, pp. 14-18). Additionally, the physical exam portion of this encounter record both confirms that petitioner was examined for the new complaint he did raise (again, a balance problem) and reports that petitioner had full range of motion of his upper extremities. (Ex. 2, p. 15. *But see* note 4, *supra*.) Accordingly, the evidence demonstrates that the encounter was not *limited to* review of the CT scan. Instead, the encounter is better understood as a general, if not comprehensive, primary care appointment, which is a type of appointment at which one might expect a complaint such as shoulder pain to be raised. Indeed, petitioner's later referrals for physical therapy and orthopedic evaluation of his shoulder pain did later originate from the same primary care office. (Ex. 5, pp 116-17.) Thus, the October 15, 2019 encounter record does constitute evidence weighing against petitioner's allegation of a 48-hour post-vaccination onset of shoulder pain.

Petitioner avers that, despite immediate post-vaccination pain, "I did not seek in-person medical treatment with the urgency I otherwise would have due to safety concerns associated with the COVID-19 pandemic and suggestions and orders from governmental bodies and the health community that limited travel and access to certain medical services." (Ex. 1, p. 3.) However, while this certainly could help explain petitioner's later pattern of care, it does not explain why petitioner did not report shoulder pain at a primary care encounter in October of 2019 or why he would have delayed seeking care prior to about March of 2020, when Covid-related shutdowns began in the U.S. Although the corresponding medical records have not been filed, there are indications within the medical records that petitioner did first seek care for his

shoulder pain in February of 2020, at which time he was then referred to physical therapy with a listed onset date for his left shoulder pain of February 25, 2020. (Ex. 2, pp. 1, 6; Ex. 4, p. 5; Ex. 15, pp. 3, 7.) While I do not necessarily conclude that the evidence preponderates in favor of a February 2020 onset of shoulder pain, these notations do significantly muddy the waters, especially given that they are in harmony with the fact that petitioner did not report shoulder symptoms at his October 15, 2020 encounter.[9]

No medical encounter record documents petitioner's alleged history of post-vaccination shoulder pain until his physical therapy encounter of June 15, 2020, more than eight months post-vaccination. (Ex. 4, p. 5.) At that time, although petitioner associated his pain to his vaccination, he was no more specific than to state that onset occurred at some time "in October 2019." (*Id*.) With the vaccination at issue having occurred on September 28, 2019, this notation is explicit in placing onset beyond 48-hours post vaccination. However, even if granting petitioner the inference that he simply could not recall the precise date of his vaccination,[10] the description "in October 2019" is still too broad to reasonably implicate a 48-hour onset without more, especially because it *also* encompasses a period after the October 15, 2019 primary care encounter at which he did not report any shoulder pain. Standing alone, the fact that a petitioner perceives their pain as vaccine-related does not automatically mean it occurred within 48 hours of vaccination. *E.g. Robinson v. Sec'y of Health & Human Servs*., No. 21-32V, 2024 WL 4200125, at *8 (Fed. Cl. Spec. Mstr. Aug. 19, 2024) (explaining that in that case "the records confirm that petitioner reported onset occurring about two weeks post-vaccination while also explicitly suspecting the symptoms were vaccine-related.") When petitioner subsequently established care with Dr. McKinney in October of 2020 (Ex. 2, p. 1) and when he sought orthopedic care from Dr. Oates in December of 2020 (Ex. 7, p. 2), the history he provided was likewise no more specific than to indicate that petitioner experienced pain "after" vaccination.[11]

---

[9] Later primary care records also indicate that petitioner reported having received an unspecified formulation of a zoster vaccine on December 13, 2019, between the time of his October 15, 2019 primary care encounter and his later referral to physical therapy. (Ex. 11, pp. 63, 84.)

[10] However, such an inference is undermined by the fact that petitioner did correctly report at subsequent medical encounters that his flu vaccination had been administered in late September. (Ex. 2, p. 1; Ex. 7, p. 2.)

[11] By that time, the medical records specifically note that petitioner had retained an attorney relative to his alleged vaccine injury. (Ex. 7, p. 2.) Indeed, petitioner filed this action in January of 2021, the month following his first appointment with Dr. Oates. While I do give these encounter records weight as genuine treatment records, this does still represent a consideration in the overall weighing of these specific records against the record as a whole. *See Crittenden v. Sec'y of Health & Human Servs*., No. 21-0215V, 2024 WL 5261958, at *9 (Fed. Cl. Spec. Mstr. Nov. 21, 2024) (inferring that medical visit made during litigation may have been for the purpose of bulwarking the claim "as much, if not more than, for treatment of an actual medical concern"); *Watts v. Sec'y of Health & Human Servs*., No. 17-1494V, 2019 WL 4741748, at *7 (Fed. Cl. Spec. Mstr. Aug. 13, 2019) (treatment record obtained just before filing claim is of "greatly reduce[d] . . . probative value"); *Milik v. Sec'y of Health & Human Servs*., No. 01-64V, 2014 WL 6488735, at *12 n.16 (Fed. Cl. Spec. Mstr. Oct. 29, 2014) (giving less weight to record created for litigation purposes), *mot. for rev. denied*, 121 Fed. Cl. 68 (2015), *aff'd*, 822 F.3d 1367 (Fed. Cir. 2016).

While it would not be reasonable to expect petitioner's medical records to include language directly parallel to that of the Vaccine Injury Table, *accord* § 300aa-13(b)(2), the histories available in this case, though they do subjectively associate petitioner's pain to vaccination, are vague with respect to timing. Overall, the medical records reflect a paucity of specific notations as to onset that stands in contrast to many other SIRVA cases in which medical records readily offer reasonably specific descriptions of onset fairly interpreted as indicative of a Table SIRVA. *E.g.*, *Chen v. Sec'y of Health & Human Servs.*, No. 21-0982V, 2025 WL 1454103, at *6 (Fed. Cl. Spec. Mstr. Apr. 4, 2025) (explaining that while "after" vaccination leaves room for interpretation, "ever since" is fairly understood as meaning onset was immediate); *Williams v. Sec'y of Health & Human Servs.*, No. 17-1046V, 2020 WL 3579763, at *5 (Fed. Cl. Spec. Mstr. Apr. 1, 2020) (crediting a notation of "after" vaccination when paired with a notation of "x 3 months" and where other records indicated pain occurred "since, "after receiving," "following," and "very soon after" vaccination). Moreover, as explained above, the medical records provide some specific reasons to doubt a 48-hour onset given that (1) petitioner's shoulder pain was neither reported nor detected during his only documented, reasonably contemporaneous medical encounter on October 15, 2019; (2) he did not begin to report this history until more than eight months after the alleged onset; and (3) the medical records also include contradictory notations of an onset occurring in February of 2020.

The only evidence of record that specifically places the onset of petitioner's symptoms within 48 hours of his vaccination are his own sworn statements. Of course, sworn statements are entitled to some weight. In this case, however, petitioner's statements raise two credibility issues. First, petitioner's account has not been consistent. When petitioner first filed his petition, he averred that he had no history of prior left shoulder pain. (Ex. 1, p. 1.) It was only after being prompted by the court to address the fact that his medical records were to the contrary that petitioner ultimately conceded that he did have a prior history of left shoulder pain, albeit allegedly intermittent. (Ex. 14, p. 1.) Second, it is concerning that petitioner has been unable to produce medical records that corroborate his recollection that he had multiple primary care encounters regarding his shoulder pain in the months following his vaccination and prior to his physical therapy evaluation. (Ex. 1, p. 2.) As explained above, the limited medical records that are available with respect to the physical therapy referral place onset of petitioner's shoulder pain in February of 2020.

For all these reasons, petitioner has not met his burden of proof under the second SIRVA criterion.

    d. <u>SIRVA QAI (3) – Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered</u>

The third SIRVA criterion requires that the post-vaccination pain and reduced range of motion be limited to the affected shoulder. 42 C.F.R. § 100.3(c)(10)(III). This requirement encompasses an affirmative showing that the petitioner's presentation included a reduction in range of motion. *Bolick v. Sec'y of Health & Human Servs.*, No.

20-893V, 2023 WL 8187307, at *6-8 (Fed. Cl. Spec. Mstr. Oct. 19, 2023).  Otherwise, the third SIRVA criterion focuses on whether "the condition is localized to the shoulder." *Chu v. Sec'y of Health & Human Servs.*, No. 21-1185, 2026 WL 248647, at *29 (Fed. Cl. Jan. 28, 2026) (emphasis omitted) (citing 82 Fed. Reg. 6294, 6296); *see also Grossmann v. Sec'y of Health & Human Servs.*, No. 18-00013V, 2022 WL 779666, at *16 (Fed. Cl. Spec. Mstr. Feb. 15, 2022); *Werning v. Sec'y of Health & Human Servs.*, No. 18-0267V, 2020 WL 5051154, at *10 (Fed. Cl. Spec. Mstr. July 27, 2020) (finding that a petitioner satisfied the third SIRVA QIA criterion where there was a complaint of radiating pain, but the petitioner was "diagnosed and treated solely for pain and limited range of motion to her right shoulder").

More specifically, in *Chu*, the Court of Federal Claims explained that the third SIRVA criterion does not indicate that "a petitioner experiencing pain in the shoulder in addition to pain elsewhere is foreclosed from entitlement because the pain is not limited only to the shoulder."  2026 WL 248647, at *29.  Rather, "so long as petitioner has *one* condition localized to the shoulder, SIRVA is satisfied."  *Id*.  I have also previously reached a similar conclusion.  *Grossman*, 2022 WL 779666, at *16 (finding the third SIRVA criterion met where "the evidence does not preponderate in favor of any finding that petitioner had diagnostically meaningful complaints of pain or reduced range of motion beyond her left shoulder"); *see also Montana v. Sec'y of Health & Human Servs.*, No. 20-873V, 2023 WL 7338887, at *11 (Fed. Cl. Spec. Mstr. Oct. 16, 2023) (observing that "[t]here is no readily apparent reason to doubt that a person with a preexisting right shoulder complaint could subsequently suffer an unrelated left shoulder injury").  Although the *Chu* opinion includes some criticism of the prior *Grossman* ruling,[12] both *Chu* and *Grossman* quote the same language from the government's response to public comment, which indicates that the third SIRVA criterion is intended to examine whether "the condition is localized to the shoulder."  *Chu*, 2026 WL 248647, at *29; *Grossman*, 2022 WL 779666, at *15.  The *Grossman* ruling, which found the petitioner in that case entitled to compensation, interpreted this language as instructing that symptoms beyond the affected shoulder are significant under the third criterion only if they reflect "patterns of pain or reduced range of motion indicative of a contributing etiology beyond the confines of a musculoskeletal injury to the affected shoulder," *i.e.*,

---

[12] Citing the "pro-claimant" nature of Vaccine Act proceedings, the *Chu* opinion takes specific issue with the phrasing of the *Grossman* ruling that the third SIRVA criterion "guard[s] against compensating" petitioners with certain clinical presentations.  2026 WL 248647, at *27-28.  Within a discussion heading, the Court queries "whether special masters are tasked to 'guard against compensation.'"  *Id*. at *27.  It is important to note the context for the language used in *Grossman*.  "Conditions and injures that do not meet the terms of the qualifications and aids to interpretation are not within the Table."  42 C.F.R. § 100.3(a).  The phrase "guard against compensating" as used in the *Grossman* ruling refers only to the fact that the QAI themselves represent the contours (and limits) of the *respondent's* expansion via his rulemaking for SIRVA of the causal presumption available under the Vaccine Injury Table.  *See Durham v. Sec'y of Health & Human Servs.*, No. 17-1899V, 2023 WL 3196229, at *12 (Fed. Cl. Spec. Mstr. May 2, 2023) (explaining that "[a]s I have indicated in prior cases, the government's comment response reveals that the third SIRVA criterion is intended to ensure that SIRVA claims are limited to instance in which 'the condition is localized to the shoulder injury in which the vaccine was administered.'  Thus, it is clear that the gravamen of this requirement is to guard against compensating claims involving patterns of pain or reduced range of motion indicative of a contributing etiology beyond the confines of a musculoskeletal injury to the affected shoulder." (emphasis omitted)).

that the symptoms at issue constitute evidence that the condition at issue is not localized to the shoulder.  2022 WL 779666, at *15.

Here, respondent has not argued that petitioner has failed to demonstrate a reduction in his left shoulder range of motion.  However, respondent argues that petitioner's physical therapy evaluation in particular demonstrated symptoms beyond his left shoulder.  (ECF No. 53, p. 9 (citing Ex. 4, p. 5).)  Nonetheless, petitioner argues that his treatment was focused on his left shoulder, stressing that he had MRI evidence supporting left shoulder dysfunction and never had any diagnoses beyond his left shoulder.  (ECF No. 52, p. 13.)  In light of the analyses under SIRVA criteria (i) and (iv), I agree with petitioner.  Respondent is correct that there were some complaints beyond the left shoulder; however, in the face of the evidence otherwise indicating that petitioner's condition was attributed by his treating physicians entirely to glenohumeral osteoarthritis, which is a condition localized to the shoulder, there no evidence in the record identifying any medical or diagnostic significance to the incidental complaints of symptoms beyond the left shoulder that would raise an issue on the third SIRVA criterion.

For all these reasons, petitioner has met his burden of proof under the third SIRVA criterion, though satisfaction of this element alone does not entitle petitioner to compensation for a Table SIRVA.

e.  SIRVA QAI (4) – No other condition or abnormality is present that would explain the patient's symptoms.

The fourth SIRVA criterion requires that "[n]o other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy)."  42 C.F.R. § 100.3(c)(10)(iv).  This element of petitioner's showing "requires consideration of a petitioner's medical condition as a whole."  *Record v. Sec'y of Health & Human Servs.*, 175 Fed. Cl. 673, 680 (2025).  While the "other condition or abnormality" at issue must qualify as an explanation for the petitioner's symptoms, it "need not be a better or more likely explanation."  *French v. Sec'y of Health & Human Servs.*, No. 20-0862V, 2023 WL 7128178, at *6 (Fed. Cl. Spec. Mstr. Sep. 27, 2023).  Indeed, a petitioner may fail to meet the fourth SIRVA criterion even where there is clinical evidence of an alternative condition that falls short of a definitive diagnosis.  *Durham v. Sec'y of Health & Human Servs.*, No. 17-1899V, 2023 WL 3196229, at *13-14 (Fed. Cl. Spec. Mstr. May 2, 2023) (noting that the regulation cites "clinical evidence of" various conditions).  Ultimately, where the presence of another condition is apparent, petitioner bears the burden of proving that the condition nonetheless "would not explain" his symptoms.  *Id*. at *14.

Here, petitioner's claim fails under the fourth SIRVA criterion for essentially the same reasons as discussed relative to the first criterion.  Namely, petitioner's treating physicians attributed his symptoms to chronic glenohumeral osteoarthritis unrelated to his vaccination.  However, petitioner does advance some additional arguments specific

to this element.  And indeed, as I have previously observed, when an intrinsic shoulder issue such as glenohumeral osteoarthritis is at issue as a potential alternative condition, the fourth SIRVA criterion must be carefully examined to determine that the condition fully explains the clinical presentation independent of vaccination.  *Lang*, 2020 WL 7873272, at *13; *see also Pulsipher v. Sec'y of Health & Human Servs.*, No. 21-2133V, 2025 WL 1364203, at *10 (Fed. Cl. Spec. Mstr. Apr. 24, 2025) (finding treating physician diagnosis of osteoarthritis wholly explained the symptoms alleged to be a SIRVA), *mot. for rev. denied*, 179 Fed. Cl. 268 (2025).  Respondent does not defeat a Table SIRVA claim "simply by noting the presence of shoulder dysfunction beyond deltoid bursitis."  *Grossmann*, 2022 WL 779666, at *16.  Moreover, petitioner does not bear a burden of demonstrating that his symptoms are vaccine-caused in order to demonstrate a Table SIRVA.  *Lang*, 2020 WL 7973272, at *13 n.9.  However, as explained above, petitioner does need to demonstrate that his diagnosed glenohumeral osteoarthritis "would not" explain his symptoms.  *Pulsipher*, 2025 WL 1364203, at *10-11; *Durham*, 2023 WL 3196229, at *14.

First, petitioner argues that glenohumeral osteoarthritis is not a better explanation for his shoulder pain because it does not explain his new "sudden onset of severe left shoulder pain with associated reduced range of motion" and, "[h]ad his symptoms been related to his osteoarthritis, Petitioner would have described those symptoms as a more gradual onset."  (ECF No. 52, p. 13.)  This argument is significantly undermined by the above analysis and conclusion relative to the second SIRVA criterion.  Moreover, neither the histories that petitioner provided to his physicians nor his written statements for this case actually indicate that petitioner experienced a sudden rather than gradual onset of worsening pain.  Nor is his pattern of treatment-seeking obviously indicative of a sudden onset of pain.  While not necessarily dispositive of onset, a delay in seeking treatment can be probative as to likely pain severity.  *E.g.*, *Shields v. Sec'y of Health & Human Servs.*, No. 20-1970V, 2024 WL 5261893, at *6 (Fed. Cl. Spec. Mstr. Nov. 26, 2024) (finding entitlement to compensation for a SIRVA despite a delay in seeking treatment, but noting that "the delay speaks to the extent of Petitioner's suffering – for his injury appears to have been manageable, with his use of self-care for over three months before professional medical assistance was sought").  Although it is clear that petitioner does associate a worsening of his pain with his vaccination, petitioner described his pain as progressing from normal post-vaccination arm soreness to severe pain and reduced range of motion by the time he began to seek medical treatment, which is more consistent with a gradual onset, given the length of time it took him to seek such treatment.  (Ex. 4, p. 5 (noting "Left deltoid pain initially, but now he has pain from there all the way down to his left hand"); Ex. 1, p. 2 (describing the shoulder pain as "progressive" and explaining that "[i]nitially, I believed the pain would resolve with regular movement, and that my pain was typical for the type of vaccine administered, but instead, my pain continued to increase").)

In any event, even if onset of his pain was not gradual, he still has not presented any evidence to suggest that the pattern of onset he experienced is inconsistent with his diagnosed glenohumeral osteoarthritis.  *E.g.*, *Pulsipher*, 2025 WL 1364203, at *11 (explaining based on expert opinion that "the fact that petitioner's pain first arose in the

18

post-vaccination period is not dispositive.  Although both experts agree that the degenerative changes underlying osteoarthritis develop over years, onset of pain does not necessarily likewise occur gradually." (internal citations omitted)).  As explained in greater detail in the analysis of the first SIRVA criterion, although Dr. Oates sought to reconcile petitioner's report of a post-vaccination symptom onset with the rendered diagnosis of osteoarthritis, Dr. Oates ultimately disclaimed the ability to attribute petitioner's osteoarthritis and related symptoms to the vaccination.[13]  Thus, Dr. Oates's medical records and opinion, when considered as a whole, do not preponderantly establish that petitioner's clinical presentation would not be explained by osteoarthritis alone.  And, again, petitioner has not presented an expert opinion to otherwise support such a contention.

Second, petitioner argues that his MRI includes evidence of an acute inflammatory injury.  (ECF No. 52, p. 13.)  Specifically, petitioner argues that the findings of tendinosis of the supraspinatus tendon and synovitis are consistent with an acute injury.  (*Id*.)  There are two issues with this argument.  First, petitioner's MRI was not performed until December 7, 2020, more than a year after petitioner alleges his SIRVA to have occurred and more than ten months since petitioner first began seeking treatment for left shoulder pain.  (Ex. 7, p. 5.)  Accordingly, even accepting these findings as evidence of an inflammatory process, they would not readily speak to the acuteness of the inflammatory process.  Second, and relatedly, contrary to what petitioner argues, his treating orthopedist interpreted the MRI results as showing "degenerative joint disease" with "no evidence of fluid collection or complication in the deltoid muscle from the flu shot."  (*Id*.)  In fact, he specifically concluded that "[t]he findings on the MRI are consistent with chronic osteoarthritis of the left shoulder."  (*Id*.)  Dr. Oates was clearly aware of the other findings of tendinosis and synovitis when he reached this conclusion, but did not note them to be significant.

Third, petitioner argues that "[i]t would be unusual for Petitioner, who is right hand dominant, to only develop severe osteoarthritis in one shoulder and no symptoms whatsoever in the opposite shoulder.  Instead, Petitioner's sudden, severe pain in his left shoulder is better explained by an acute, vaccine injury."  (ECF No. 52, pp. 13-14.)  Again, this argument relies on a conception of a "sudden and acute" onset of pain that is not preponderantly supported.  But in any event, it does not ring true, given that petitioner's x-rays, MRI, and CT scan, all objectively confirmed the presence of osteoarthritis in his left shoulder, even revealing "bone on bone" changes.  (*E.g.*, Ex. 7, pp. 3, 5; Ex. 13, p. 9.)  The health of petitioner's right shoulder cannot negate the fact of these objective findings.  Nor does it readily imply that petitioner's left shoulder pain was vaccine-related, given that the pain pre-dated the vaccination, as discussed relative to the first SIRVA criterion.  Moreover, petitioner was diagnosed by both his primary care provider (Ex. 2, p. 6) and his orthopedist (Ex. 7, pp. 3, 5) with osteoarthritis of the left shoulder, and neither raised any concern regarding the health of petitioner's right shoulder as a reason to doubt the diagnosis.

---

[13] Again, *see* n. 8, *supra*.

Finally, petitioner argues that the fact that he experienced relief from his cortisone injection supports the idea that petitioner's shoulder condition "is more of an inflammatory-type injury than osteoarthritis." (ECF No. 52, p. 14.) This is not persuasive because Dr. Oates specifically provided the cortisone injection as treatment for arthritis. (Ex. 7, p. 5 (explaining "[i]n terms of treatment of the arthritis [I] explained his long-term option includes the possibility of total shoulder replacement. I may be able to give him some symptomatic relief with corticosteroid injection.").)

For all these reasons, petitioner has not met his burden of proof under the fourth SIRVA criterion.

### f. Causation-in-fact and factor unrelated to vaccination

Petitioner has neither pleaded (ECF No. 1) nor argued (ECF No. 52) that compensation should be awarded on a cause-in-fact basis. However, I briefly note in the interest of completeness that the record evidence would not in any event support such a claim.

To demonstrate causation-in-fact, petitioner would need to show by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury in order to prove causation-in-fact. *Althen*, 418 F.3d at 1278. Moreover, such a claim must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1). That medical opinion must be based on sound and reliable scientific or medical reasoning. *Boatmon v. Sec'y of Health & Human Servs.*, 941 F.3d 1351, 1359-60 (Fed. Cir. 2019).

As also explained with respect to the first SIRVA criterion, while Dr. Oates did not entirely rule out petitioner's vaccine as a contributing factor, there are several reasons why Dr. Oates's opinion is not persuasive. First, it was based on the false assumption that petitioner's shoulder had be previously asymptomatic.[14] Especially given that Dr. Oates was attempting to reconcile petitioner's reported history with his separate opinion that petitioner suffered osteoarthritis *not* caused by his vaccine, one cannot merely assume that Dr. Oates's opinion would be the same with knowledge of petitioner's prior history. Second, Dr. Oates's opinion was both vague and tentative at best. To the extent he ultimately suggested post-vaccinal muscle aches could lead to shoulder joint pain, he did not provide any explanation that could support a theory of causation under

---

[14] *Dobrydnev v. Sec'y of Health & Human Servs.*, 566 F. App'x 976, 982-83 (Fed. Cir. 2014) (holding that the special master was correct in noting that "[w]hen an expert assumes facts that are not supported by a preponderance of the evidence, a finder of fact may properly reject the expert's opinion" (alteration in original) (quoting *Dobrydneva v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2010 WL 8106881, at *9 n.12 (Fed. Cl. Spec. Mstr. Oct. 27, 2010), *rev'd*, 98 Fed. Cl. 190 (2011), *rev'd sub nom. Dobrydnev v. Sec'y of Health & Human Servs.*, 566 F. App'x 976 (Fed. Cir. 2014)) (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993))); *Bushnell v. Sec'y of Health & Human Servs.*, No. 02-1648V, 2015 WL 4099824, at *12 (Fed. Cl. Spec. Mstr. June 12, 2015) (finding that "because Dr. Marks' opinion is based on a false assumption regarding the onset of J.R.B.'s condition, and the incorrect assumption of a 'stepwise regression' after each vaccine administration, it should not be credited").

*Althen* prong one. (Ex. 7, p. 5.) And, third, his initial support for vaccine causation was either softened, or even retracted, once petitioner's MRI results were available.

As respondent stressed in his motion response, Dr. Oates initially stated that "I think that his symptoms currently are mostly due to the arthritic change" and ultimately that the vaccine "did not cause the underling chronic arthritis. I've explained to him that this is in association in time but I cannot prove causation." (ECF No. 53, p. 10 (quoting Ex. 7, pp. 3, 5).) "Although probative, neither a mere showing of a proximate temporal relationship between vaccination and injury, nor a simplistic elimination of other potential causes of the injury suffices, without more, to meet the burden of showing actual causation." *Althen*, 418 F.3d at 1278. Thus, "[a] treating physician's recognition of a temporal relationship does not advance the analysis of causation." *Isaac v. Sec'y of Health and Human Servs*., No. 08-601V, 2012 WL 3609993, at *26 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for rev. denied*, 108 Fed. Cl. 743 (2013), *aff'd per curiam*, 540 F. App'x 999 (Fed. Cir. 2013).

Finally, I note that, even if one were to conclude that some of Dr. Oates's notations provide some support for petitioner's claim when taken in isolation (under either a Table or causation-in-fact analysis), respondent also argues that the record evidence in any event preponderates as a whole in favor of the conclusion that petitioner's condition is due to a factor unrelated to vaccination, namely his chronic osteoarthritis. (ECF No. 53, p. 10; § 300aa-13(a)(1)(B).) For all the reasons discussed throughout this decision, I agree.

## V.    Conclusion

Petitioner clearly suffered and he does have my sympathy. However, for all the reasons discussed above, there is not preponderant evidence of any compensable injury under the standards set by this program. Therefore, pursuant to § 300aa-12(d)(3)(A) and Vaccine Rule 10, this decision concludes that petitioner is not entitled to an award of compensation. Absent a timely motion for review, the Clerk is directed to enter judgment dismissing this case for insufficient proof in accordance with Vaccine Rule 11(a).

**IT IS SO ORDERED.**

<u>**s/Daniel T. Horner**</u>
Daniel T. Horner
Special Master

21